Lisa Faye Petak (CA SBN: 300914)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, New York 10003
Telephone: (212) 440-1338
Facsimile: (646) 293-4304
E-mail: lpetak@weitzlux.com

Ellen Relkin (NJ SBN: 006691985)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, New York 10003
Telephone: (212) 558-5715
Facsimile: (212) 344-5461
E-mail: erelkin@weitzlux.com

*Attorneys for Plaintiff, Stephen Turner.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docket Case No: 1:14-cv-01748 |
| | Honorable Matthew F. Kennelly |
| THIS DOCUMENT RELATES TO: | |
| **STEPHEN EUGENE TURNER,** | **COMPLAINT** |
| **Plaintiff,** | **and** |
| **v.** | **DEMAND FOR JURY TRIAL** |
| **ELI LILLY AND COMPANY and LILLY USA LLC,** | Civil Action No: |
| **Defendants.** | |

Plaintiff, STEPHEN TURNER, individually ("Plaintiff") and through his attorneys,

WEITZ & LUXENBERG, P.C., upon information and belief, alleges as follows:

## PROCEDURAL AND FACTUAL BACKGROUND

### A.    INTRODUCTION

1.    This case involves the prescription drug AXIRON®, which is manufactured, sold, distributed and promoted by the Defendants LILLY USA, LLC and ELI LILLY AND COMPANY (hereinafter "Defendants" or "LILLY") as a testosterone replacement therapy.

2.    Defendants misrepresented that AXIRON® is a safe and effective treatment for hypogonadism and a condition they referred to as "low testosterone," or "Low T," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thromboembolic events.

3.    AXIRON® is an exogenous form of the androgen testosterone. It regulates the expression of platelet $TXA_2$ receptors in humans, which significantly increases platelet aggregation. It causes an increase in hematocrit and estradiol in adult males, resulting in thickened blood, the development of blood clots, and heart damage. These effects, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thromboembolic events, including but not limited to deep vein thrombosis, pulmonary embolism, transient ischemic attacks, ischemic stroke, and numerous types of cardiovascular injuries.

4.    AXIRON® is delivered transdermally and is applied to the skin in the form of a gel. It is available in a 2% concentration and is to be applied to the underarms.

5.    Defendants failed to adequately warn physicians about the risks associated with the AXIRON® and the monitoring required to ensure their patients' safety.

6.    Defendants engaged in aggressive, unbranded, and award-winning, direct-to-consumer and physician marketing and advertising campaign to alert men that they might be suffering from "Low T," an abbreviated term for low testosterone.

- 2 -

7.     According to the industry-leading Androgen Deficiency in Adult Males ("ADAM"), or *Is it Low T?* quiz, the symptoms of "Low T" include being "sad or grumpy," "experiencing deterioration in the ability to play sports," and "falling asleep after dinner." *Available at*: http://www.isitlowt.com/do-you-have-low-t/low-t-quiz (last visited October 21, 2014).  Most doctors agree that these symptoms can be caused by an abundance of factors, the most prominent of which is the natural aging process.

8.     The FDA has not approved any testosterone replacement therapy drug as a treatment for low testosterone or "Low T."  Additionally, low testosterone is not a disease recognized by the medical community.  Instead, it is a normal result of the aging process experienced by the majority of males.

9.     As a result of this "disease mongering," as termed by Dr. Adriene Fugh-Berman of Georgetown University Medical Center, diagnoses of "Low T" have increased exponentially. This has directly related to AXIRON®'s sales increasing to over $178.7 million per year.

10.     Consumers of AXIRON® and their physicians relied on the companies false representations and were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thromboembolic events.


**B.     PARTIES**

11.     Plaintiff STEPHEN TURNER is a resident and citizen of South Carolina.  He is a resident of Horry County, and his address is 1635 Crystal Lake Drive, Myrtle Beach, South Carolina, 29575.

12.     Defendant ELI LILLY AND COMPANY is a corporation organized and existing under the laws of Indiana with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana, 46285, and is therefore deemed a citizen of Indiana.  At all relevant times

herein, Defendant was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including AXIRON®, in the states of Indiana and Illinois, and therefore is subject to the jurisdiction and venue of this Court.

13.     Defendant LILLY USA, LLC is a limited liability company operating as a wholly owned subsidiary of Defendant ELI LILLY AND COMPANY, with its principle place of business at Lilly Corporate Center, Indianapolis, Indiana, 46285, and is therefore deemed a citizen of Indiana.

14.     By way of background, Acrux Limited originally developed AXIRON®.   In March 2010, Acrux and ELI LILLY AND COMPANY entered into an exclusive worldwide license agreement for the commercialization of AXIRON®.  On November 23, 2012, AXIRON® received FDA approval to treat hypogonadism.

15.     Upon information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the United States of America, including the States of Illinois and South Carolina, and Defendants derived and derive substantial revenue from interstate commerce.


C.     **JURISDICTION AND VENUE**

16.     Subject matter of this action arises under 28 U.S.C. § 1332.  The parties are citizens of different states and, based on the severity and nature of Plaintiff's physical, economic, and emotional injuries, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17.     This Court has personal jurisdiction over the Defendants because the Defendants have their primary place of business in Illinois and regularly conduct business in South Carolina.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in, and because the Defendants transact business in, this district.

19.     This Court has jurisdiction of this action pursuant to Multi-District Litigation Order 2545.  As a civil action for personal injury related to testosterone replacement therapy products, this action pertains to Master Docket Number 1:14-cv-01748.

20.     Additionally, as per MDL 2545 Case Management Order 12, this action may be directly filed in this Court.  Should this action be remanded, the court of Plaintiff's residence, the United States District Court for the District of South Carolina, shall have jurisdiction.

### D.     FACTUAL BACKGROUND

#### 1.     General Allegations

21.     This action is for damages brought on behalf of Plaintiff STEPHEN TURNER who was prescribed and supplied with, received, and who has taken and applied the prescription drug AXIRON®, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold, or otherwise placed in the stream of interstate commerce by Defendants.  This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug.

22.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

23.     At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing,

formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, and/or advertising for sale or selling the prescription drug AXIRON® for the use and application by men, including, but not limited to, Plaintiff STEPHEN MILLER.

24.     At all times herein mentioned, Defendants were authorized to do business within the states of South Carolina and Illinois.

25.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

26.     Plaintiff files this lawsuit within the applicable limitations period of first suspecting that said drug caused the appreciable harm sustained by Plaintiff.  Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of Plaintiff's injuries as their cause was unknown to Plaintiff.  Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action.  Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that the drug AXIRON® is safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

## 2.  Regulatory History and Approved Uses

27.  Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

28.  The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

29.  In men, testosterone levels normally begin a gradual decline after the age of thirty.

30.  The average testosterone levels for most men range from 300 to 1,000 ng/dl of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who may have testosterone levels below 300 ng/dl on one day will have normal testosterone levels the next.  Additionally, testosterone levels gradually decline as men age.  This decline in serum testosterone levels is a normal process that does not represent a medical condition or disease.

31.  The Food and Drug Administration approved AXIRON® on November 23, 2010, for the treatment of adult males who have low or no testosterone (a condition called hypogonadism) in conjunction with an associated medical condition.  Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.  After FDA approval, AXIRON® was widely advertised and marketed by Defendants as a safe and effective testosterone replacement therapy.

32.  Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the severely diminished production or nonproduction of testosterone. Primary hypogonadism occurs under circumstances of congenital or acquired pathologic insults to and conditions of the testes in men. Secondary hypogonadism occurs under circumstances of hypogonadotropism, including hypothalamic-pituitary diseases and disorders and other conditions which cause suppression of gonadotropin-releasing hormone (GnRH).

33.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled *Trends in Androgen Prescribing in the United States, 2001 – 2011* indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.   A Canadian study showed that only about 6.3% of men who were prescribed testosterone actually met the diagnostic criteria for hypogonadism.

34.     At all times material hereto, and since the time that AXIRON® first received approval from the FDA, the Defendants knew and understood the FDA-approved indications for clinical use of the AXIRON® product.


### 3.     Direct to Consumer Marketing and Promotion to Physicians for Unbranded/Off-Label Use.

35.     Defendants expanded the indications for use by promoting and detailing "Low T" as an acquired form of hypogonadism, and advanced an intentional ambiguity in the testosterone replacement therapy product labeling as a basis for "label expansion" and "off-label" marketing, detailing, and promotion to physicians.

36.     Defendants have continued to market and promote testosterone replacement therapy for "andropause" and "Low T."

37.     In a press release from March 15, 2010, LILLY announced that they entered into an exclusive worldwide license agreement with Acrux for the future commercialization of AXIRON®.  LILLY stated that AXIRON® would treat "men suffering from low testosterone."[1]

---

[1] *Lilly to Acquire Global License to AXIRON Testosterone Solution from Acrux*, ,LILLY.COM, https://investor.lilly.com/releasedetail.cfm?ReleaseID=452131, March 15, 2010 (last visited January 26, 2015).

38.     In its announcement of AXIRON®'s FDA approval on November 23, 2010, LILLY estimated that "up to 13 million men over 45 years of age in the U.S. may have symptoms associated with low testosterone."[2]

39.     On its Axiron.com website, LILLY states: "Indication: AXIRON is used to treat adult males who have low to no testosterone."[3]

40.     Defendants coordinated a massive advertising campaign targeted toward men who did not have hypogonadism, nor had low or no testosterone in conjunction with an associated medical condition. The direct to consumer marketing was designed to convince men that they suffered from a non-existent and unrecognized medical condition called "Low T," which is a term for low testosterone. Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential AXIRON® users, and online media including the unbranded website *IsItLowT.com*.

41.     The Defendants' television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

_____

[2] *Lilly and Acrux Receive FDA Approval for Axiron® (Testosterone) Topical Solution CIII*, LILLY.COM, https://investor.lilly.com/releasedetail.cfm?ReleaseID=532924, (last visited January 26, 2015).

[3] AXIRON.COM.

42.     The advertisements disseminated by LILLY suggested that various symptoms often associated with other conditions may be caused by low testosterone and encouraged men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone.  These "symptoms" included "decreased sexual desire (libido)," "erectile dysfunction," "fatigue and loss of energy," "depressed mood," "loss of body hair (decreased need to shave)," "decrease in strength," and "osteoporosis (decreased bone density)."[4] All of these are general symptoms that are often a result of aging, weight gain, or lifestyle, rather than conditions associated with hypogonadism.

43.     Since the FDA approved AXIRON® for a very specific medical condition called hypogonadism, Defendants have also sought to convince primary care physicians that hypogonadism is synonymous with "Low T" and that low testosterone levels are widely under-diagnosed, and that normal and common conditions associated with normal aging could be caused by low testosterone levels.

44.     In 2013, Lilly spent approximately 20% of its $122 million advertising budget for AXIRON® on detailing physicians about AXIRON® and "Low T."

45.     While running their disease awareness campaigns, Defendants promote their products as easy to use topical testosterone replacement therapies.  For example, Defendants promote AXIRON® as the "only underarm low testosterone treatment."  Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

46.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety

---

[4] *What is Low T*, AXIRON.COM, http://www.axiron.com/low-testosterone-information.aspx (last visited on January 26, 2015).

and ease. Although prescription testosterone replacement therapy has been available for years, millions of men who have never been prescribed testosterone continue to flock to their doctors and pharmacies.

47.     LILLY makes AXIRON® even more enticing to consumers by providing an easily downloadable "Savings Card" which can be used for a free 30-day trial and up to $75 in monthly savings of AXIRON®. The solicitation states: "Pay no more than $25 per month with your FIRST MONTH FREE." Card activation requires consumers to click three buttons: (1) that you are a resident of the United States or Puerto Rico; (2) that you are 18 years old; and (3) that your prescription is not covered by insurance through the government. Once the Savings Card is downloaded and activated, consumers are directed to show the Savings Card and prescription to the consumer's pharmacist. The Savings Card solicitation fails to mention any step regarding consultation with a physician and diagnoses of Hypogonadism and associated conditions.

48.     Defendants manufactured, sold, and promoted the drug to treat a non-existent medical condition they call "Low T," which was a name it created for the constellation of symptoms experienced by men as a result of the normal aging process. In essence, Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

49.     Defendants successfully created a robust and previously nonexistent market for their drug. The amount of money invested in testosterone replacement therapy marketing has exploded in the last five years, growing five-fold from $55 million in 2009 to just under $283 million in 2013. LILLY led all testosterone manufacturers in advertising costs in 2013, spending

$122 million promoting AXIRON®, with nearly 70% of that amount, an astounding $84 million, spent on direct-to-consumer marketing.[5]

50.     As observed by Lisa M. Schwartz, M.D., M.S. and STEPHENn Woloshin, M.D., M.S. in their article *Low T as a Template: How to Sell Disease*, published in JAMA Internal Medicine 173(15):1460-1462 (August 12/26, 2013) concerning the "Low T" campaigns by the pharmaceutical industry:

> Whether the campaign is motivated by a sincere desire to help men or simply by greed, we should recognize it for what it is: a mass, uncontrolled experiment that invites men to expose themselves to the harms of a treatment unlikely to fix problems that may be wholly unrelated to testosterone levels.

> We agree with Braun that there is a strong analogy between the marketing of testosterone therapy for men and estrogen therapy for menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate that testosterone therapy for healthy aging men does more good than harm.

51.     Defendants' advertising paid off in a return of $187.7 million in AXIRON® in sales during the past year (2013).   Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, BLOOMBERG BUSINESSWEEK, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra (last visited October 23, 2014).

52.     Defendants engaged in aggressive promotion to physicians, claiming testosterone replacement therapy could be used as a lifestyle drug to treat conditions such as erectile dysfunction.   Sales representatives were instructed to tell physicians that if a patient requested

---

[5] ENCUITY RESEARCH, *Encuity Data Trends Report – Testosterone Replacement Therapy*, *available at*: http://www.campbellalliance.com/articles/Encuity%20-%20Data%20Trends%20Report%20-%20TRT%20-%20May%202014.pdf (last visited January 26, 2015).

medication for erectile dysfunction, the physician should first test the patient's testosterone level to determine if the cause of the erectile dysfunction was "Low T."

53. The marketing program sought to create the image and belief by consumers and physicians that low testosterone was an actual disease or medical condition that affected a large number of men in the United States, and that the use of AXIRON® is safe for human use as a treatment for "Low T," even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

54. At all times material hereto, Defendants' marketing strategy included the use of sales or drug detailing representatives ("reps") and marketing and brand team personnel who performed on-line and in-person AXIRON® product detailing to physicians as well as promotional and detailing to healthcare providers and physicians at medical organization and society meetings and conventions via display booths, sponsored meeting sessions and "satellite" sessions, and sponsored medical speakers.

55. Defendants' drug detailing "reps" provided physicians and healthcare providers with information and literature concerning the indications for clinical use of the AXIRON® product, as well as discount and/or rebate coupons to give to patients for the purchase of AXIRON®.

56. Defendant's drug "reps" detailed and marketed AXIRON® to physicians as a product approved and indicated for the treatment of age-related declines in testosterone levels and age-related symptoms.

57. Defendants denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T," and used the "Low T" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

- 13 -

58.     Defendants knew and understood the meaning of the terms "off-label" and "label expansion."

59.     Defendants knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

60.     Defendants marketed, promoted, and detailed AXIRON® for "off-label" use for the purpose of "label expansion," detailed and promoted the product to physicians, and advertised the product to consumers and patients, under the rubric that "Low T" was an indication for clinical use of the AXIRON® product.

61.     A manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an "off-label" purpose.

62.     A manufacturer misbrands a drug if the labelling, or any of the manufacturer's promotional and advertising materials, describe an intended use for the drug that has not been approved by the FDA.

63.     Promotional materials are misleading if they suggest that a drug is useful in the treatment of a broader range of conditions, or in a broader population of patients, than has been demonstrated by substantial evidence or substantial clinical experience.

64.     Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience.

65.     Promotional materials are misleading if they fail to reveal facts that are material in light of the representations made, or with respect to the consequences that may result from the use of the drug as recommended or suggested by the materials.

66.     The FDA did not, and never has, approved AXIRON® for the treatment of:

        a. age-related declines in testosterone levels in men;

- 14 -

b. age-related symptoms;

c. mood disorders, including depression or "grumpiness" or inability to concentrate;

d. lack of sexual interest or decreased libido;

e. disorders of erectile function or erectile dysfunction;

f. loss of muscle mass; or,

g. bone strength or density abnormalities.

### 4. Adverse Events and Serious Health Risks Caused by Testosterone Replacement Therapy.

67.     There have been a number of studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

68.     Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel, or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

69.     The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and it also results in an increase in hematocrit[6] and serum estradiol levels.[7] It can also cause increased platelet aggregation and vasoconstriction.

---

[6] Fernandez-Balsells, M., et al., *Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis*, 95(6) J. CLIN. ENDOCRIN. METAB. 2560–75 (2010).

[7] Finkelstein, JS, et al., *Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men*, 369 NEW ENGLAND J. MED. 1011–22 (2013).

70.    Hematocrit is the proportion of total blood volume that is comprised of red blood cells.   Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (such as testosterone).   When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count.   The range for normal hematocrit levels in adult males is 44%-48%.

71.    The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process known as erythrocytosis.[8]   An increase of hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia.   This is a serious medical condition that requires treatment to prevent injury.

72.    Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure.   In a published study,[9] the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

73.    Elevated hematocrit is also an independent risk factor for adverse cardiovascular events.   Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure.    In 3,523 Framingham participants, aged 50-65, who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or

---

[8] Bachman, E., et al., *Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point*, J. OF GERONTOLOGY: SERIES A, BIO SCI. AND MED. SCI. (Oct. 24, 2013).

[9] Wannamethee G., Perry IJ, Shaper AG, *Haematocrit, hypertension and risk of stroke*, 235(2) J. INTERN. MED. 163–8 (1994).

equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[10]

74.     In another study of 680 males conducted over 28 years in Finland, the data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels of less than 50%.   Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[11]

75.     In yet another large, prospective study[12] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit.  In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

76.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood.  A 10.99% increase of hematocrit produces an increase of one unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[13]   An increase in blood viscosity is a known risk factor for ischemic heart disease.[14] It can cause

[10] Coglianese, E., et al., *Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community*, 109(2) AM. J. CARDIOLOGY 241–45 (2012).

[11] Kunnas, T, et al., *Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up*, 49(1) PREV. MED. 45–47 (2009).

[12] Braekkan SK, Mathiesen EB,et al., *Hematocrit and risk of venous thromboembolism in a general population, The Tromso study*, 95(2) HAEMATOLOGICA. 270–75 (2010).

[13] Cinar, Y., et al., *Effect of hematocrit on blood pressure via hyperviscosity*, 12(7) AM. J. HYPERTENSION 739–43 (1999).

[14] Yarnell, JW, et al., *Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease*

(Continued)

- 17 -

hypertension, as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

77. The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is converted by the body (aromatized) to estradiol.[15] The increase of estradiol is in direct relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[16]

78. In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991–1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[17] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles. Atrial fibrillation is a known cause of thrombus formation.

---

(Continued)

*studies*, 83(3) CIRCULATION 836–44 (1991).

[15] Glueck, CJ, et al., *Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia*, 158(4) TRANSLATIONAL RESEARCH 225–34 (2011).

[16] Finkelstein, JS, et al., *supra* note 2.

[17] Abbott, RD, et al., *Serum Estradiol and Risk of Stroke in Elderly Men*, 68 NEUROLOGY 563–68 (2007).

79.     If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, then the estradiol can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.[18]

80.     In a study published in 2006, blood levels of estradiol were measured in 313 men whose average age was 58.  Carotid artery intima-media thickness was measured at baseline and then three years later.  After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall.  This led the researchers to conclude: "circulating estradiol is a predictor of progression of carotid artery intima-media thickness in middle-aged men."[19]  These findings of a positive association between serum estradiol levels and intima-media thickening supports the contention that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis in men.

81.     In a case control study of men in the Framingham cohort, *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[20]

82.     Estradiol has a greater effect in the male heart through the regulation of gene expression than it does in female hearts.  This effect results in impaired contractile function of the

---

[18] Glueck, CJ, et al., *Testosterone, thrombophilia, thrombosis*, 20(1) CLIN. APPL. THROMB. HEMOST. 22–30 (2014).

[19] Tivesten, A., et al., *Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men*, 91(11) J. CLIN. ENDOCRINOLOGY METAB. 4433–37 (2006).

[20] Phillips GB, Castelli WP, Abbott RD, et al., *Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort*, 74 AM. J. MED. 863–69 (1983).

heart in males with elevated levels of serum estradiol.[21]  Impaired contractile function results in numerous cardiovascular injuries and disease.

83.    A study published in 2007 compared blood levels of testosterone and estradiol in men suffering acute myocardial infarction (heart attack) with those who had previously suffered a heart attack.  Sex hormones were measured in patients presenting with acute heart attack, patients with an old heart attack, and patients with normal coronary arteries.  The results showed significantly higher levels of estradiol in both groups of heart attack patients compared with those without coronary disease.[22]  In another study, the levels of sex hormones in men admitted to the hospital with acute heart attacks were evaluated.  Compared with control patients, estradiol levels in these heart attack patients were **180%** higher.[23]

84.    High testosterone levels enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after MI, and, conversely, estrogen seems to have no significant protective effect in the acute phase after MI.[24]

85.    Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease.  Thromboxane A2 has

---

[21] Kararigas, G., et al., *Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function*, 59(4) JACC 410–17 (2012).

[22] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA, *Serum levels of sex hormones in men with acute myocardial infarction*, 28(2) NEURO. ENDOCRINOLOGY LETT. 182–86 (2007).

[23] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH, *Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors*, 28(3) ENDOCR. RES. 161–73 (2002).

[24] Maria A. Cavasin, Zhen-Yin Tao, Ai-Li Yu, Xiao-Ping Yang, *Testosterone enhances early cardia remodeling after myocardial infarction, causing rupture and degrading cardiac function*, 290(5) AM. J. OF PHYSIOLOGY H2043–50 (2006).

PLAINTIFF'S COMPLAINT

been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation. A study published in 1995 demonstrated that testosterone treatment was associated with a significant increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[25]

86.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

87.     In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," in which a large cohort of men who used testosterone taken from a Veteran's Administration database was compared against a cohort of men who did not use testosterone. The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack, and stroke by about 30%.

88.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" that indicated testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a comorbid condition. The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased. The results of this study were covered by national media outlets, including *The New York Times*.[26]

---

[25] Ajayi, A., et al., *Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses*, 91 CIRCULATION. 2742–47 (1995).

[26] Anahad O'Connor, *New Concern About Testosterone and Heart Risks*, N.Y. TIMES,

(Continued)

89.     In a study published in 2013,[27] based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting 12+ weeks reporting cardiovascular-related events, two reviewers independently searched, selected, and assessed study quality with differences resolved by consensus.  Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of cardiovascular-related events.  Their meta-analysis of the published literature also showed that the effect of testosterone therapy varied with source of funding.  In trials not funded by the pharmaceutical industry, the risk of a cardiovascular-related event on testosterone therapy was greater than in pharmaceutical industry funded trials.  The study concluded that the existing body of published medical literature demonstrates that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

### 5.    Inadequate Warnings and Labeling

90.     Defendants' marketing strategy from the beginning has been to aggressively market and sell their products by misleading potential users and their physicians about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

---

(Continued)

http://well.blogs.nytimes.com/2014/01/29/study-adds-to-concern-about-cardiac-risks-for-older-mentaking-testosterone/?_php=true&_type=blogs&ref=health&_r=0.

[27] Xu, L., et al., *Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials*, BMC MEDICINE 11:108 (2013).

91.     Defendants successfully marketed AXIRON® by undertaking a "disease awareness" marketing campaign.  This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

92.     Defendants' advertising program sought to create the image and belief by consumers that the use of AXIRON® was a safe method of alleviating their symptoms, had few side effects, and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

93.     Defendants promoted and marketed testosterone replacement therapy to physicians as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including: erectile dysfunction, loss of libido, loss of athleticism, loss of muscle mass, fatigue, and mood swings.  Defendants overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

94.     Defendants purposefully downplayed, understated, and outright ignored the health hazards and risks associated with using AXIRON®.  Defendants deceived potential AXIRON® users and their physicians by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating the definition of hypogonadism and statistics of its occurrence in men to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

95.     Defendants concealed material relevant information from potential AXIRON® users and their physicians, and minimized user and prescriber concerns regarding the safety of

AXIRON®, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

96. In particular, in the warnings that the Defendants provide in their commercials, online, and print advertisements, Defendants fail to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represent they adequately tested AXIRON® for all likely side effects. Defendants also fail to warn and instruct regarding the importance of adequate monitoring of hematocrit and estradiol levels.

97. AXIRON®'s prescribing information and medication guide contained within the package materials do not warn against stroke, pulmonary embolism, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

98. The medication guide contained within the package materials instructs patients to tell their healthcare provider the following before initiating use of AXIRON®:

• have breast cancer

• have or might have prostate cancer

• have urinary problems due to an enlarged prostate

• have heart problems

• have kidney or liver problems

• have problems breathing while you sleep (sleep apnea)

• have any other medical conditions

However, the prescribing information and medication guide contained within the package materials fail to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden

mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. They also fail to instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

99. The prescribing information and medication guide contained within the package materials do warn that the use of the product may result in increased red blood cell count, but do not instruct physicians or patients that it can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count does not warn patients and their physicians that hematocrit levels can rise by as much as 10% above normal range, nor does it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%, including the fact that individuals with a hematocrit greater than or equal to 51% have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

100. The prescribing information and medication guide contained within the package materials do instruct physicians to re-evaluate their patient's hematocrit 3 to 6 months after starting treatment, but they fail to warn patients and their physicians that the product can cause dangerous increases in hematocrit much more rapidly, and also fail to instruct physicians to monitor their patient's hematocrit more frequently.

101. The prescribing information and medication guide contained within the package materials fail to state that testosterone replacement therapy should not be administered to men who have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant because the increase in serum estradiol

caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. They also fail to instruct physicians to screen all patients for underlying clotting traits before prescribing testosterone replacement therapy.

102. The prescribing information and medication guide contained within the package materials warn that use of the product may result in the risk of blood clots in the veins, but they specifically limit this warning to "blood clots in the legs" and only warn against blood clots in the legs that form as a result of increased red blood cell count (polycythemia). There is no warning for blood clots in the veins other than "blood clots in the legs," nor is there any warning of blood clots resulting from causes other than polycythemia. Also, there are no warnings that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

103. The prescribing information and medication guide contained within the package materials fail to warn that use of the product may result in elevated levels of estradiol. They do not instruct physicians to monitor estradiol levels, nor do they provide any guidance to physicians or patients regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence in men. There is also no warning that elevated serum estradiol levels resulting from use of the product can cause impairment of contractility of the heart.

104. The prescribing information and medication guide contained within the package materials do not warn that use of the product may result in the formation of deep vein thrombosis,

pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol.

105.    The prescribing information and medication guide contained within the package materials do not offer any warning of the very serious health risks for men over the age of 65 who use testosterone replacement therapy.  There is no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use testosterone replacement therapy, despite the fact that the data supporting this finding has been available for years.  Instead, the label only states that the manufacturer lacks any information regarding the safety or efficacy of testosterone therapy for men over the age of 65.  This absence of a warning fails to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population.

106.    In November of 2013, Rebecca Vigen, Colin I. O'Donnell, Anna E. Barón, Gary K. Grunwald, et al. published an article in the Journal of the American Medical Association entitled *Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels* ("Vigen Paper").

107.    The Vigen Paper concluded: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke."  In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

108.    On January 29, 2014, William D. Finkle, Sander Greenland, Gregory K. Ridgeway, and  John L. Adams, et al. published an article in PLOS ONE entitled *Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men* ("Finkle Paper").

109.     The Finkle Paper demonstrated an increased risk of heart attack in men over age 65 years, and in men younger than 65 years with a prior history of heart disease.

110.     The increased incidence of heart attack and stroke was foreseeable at the time of the product launch of AXIRON®.

111.     On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the FDA announced it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT) <u>and</u> pulmonary embolism (PE):

### FDA adding general warning to testosterone products about potential for venous blood clots

[06/19/2014] The U.S. Food and Drug Administration (FDA) is requiring manufacturers to include a general warning in the drug labeling of all approved testosterone products about the risk of blood clots in the veins. Blood clots in the veins, also known as venous thromboembolism (VTE), include deep vein thrombosis (DVT) and pulmonary embolism (PE). The risk of venous blood clots is already included in the labeling of testosterone products as a possible consequence of polycythemia, an abnormal increase in the number of red blood cells that sometimes occurs with testosterone treatment. Because there have been postmarket reports of venous blood clots unrelated to polycythemia, FDA is requiring a change to drug labeling of all testosterone products to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products.

Because these clots occur in the veins, this new warning is not related to FDA's ongoing evaluation of the possible risk of stroke, heart attack, and death in patients taking testosterone products. We are currently evaluating the potential risk of these cardiovascular events, which are related to blood clots in the arteries and are described in the Drug Safety Communication posted on January 31, 2014.

Testosterone products are FDA-approved for use in men who lack or have low testosterone levels in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

112.     Because of this mandate by the FDA, on June 21, 2014, Defendants updated the prescribing information to provide the general warning required by FDA regarding DVT and PE, and also updated the medication guide for AXIRON® and other testosterone replacement therapies to include the significant risk of PE as follows: "Blood clots in the legs <u>or lungs</u>.  Signs and symptoms of a blood clot in your leg can include leg pain, swelling, or redness. Signs and symptoms of a blood clot in your lungs can include difficulty breathing or chest pain."  However, the prescribing information and the medication guide contained within the package materials still

lacks any warning about the risks of elevated estradiol levels, the need to screen for underlying clotting traits, and they contain no warnings for strokes, or for cardiovascular injuries.

113. The marketing and promotion of the product to patients and physicians overstated its benefits by creating the impression that it was a safe and effective treatment for a variety of aging-related conditions and symptoms, for which it was not FDA approved. This is misleading and fails to adequately warn physicians and patients about the numerous, life-threatening health risks associated with use of the drug.

114. Because of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for AXIRON®. If Plaintiff and his physician had known the risks and dangers associated with AXIRON®, the physician would not have prescribed nor would Plaintiff have taken AXIRON® and consequently would not have been subject to its serious side effects; and/or, Plaintiff's physicians would have warned and adequately monitored Plaintiff's hematocrit and estradiol levels, and, as a result, Plaintiff's injuries would have not otherwise have occurred.

### 6.  Case Specific Facts

115. Plaintiff STEPHEN TURNER was born on November 1, 1947, and is currently 67 years old.

116. Plaintiff, after his doctor diagnosed him with "Low T," began using AXIRON® spray on or around March 1, 2012.

117. As a proximate result of Defendants' conduct regarding the effectiveness and safety of AXRION®, Plaintiff's physician prescribed AXIRON® to Plaintiff.

118.    Weeks after starting the AXIRON® treatment regimen, Plaintiff experienced pain in his chest and atrial flutters on March 31, 2012. He was admitted to the hospital to treat these conditions.

119.    On or around February 6, 2013, Plaintiff again experienced an atrial fibrillation and received emergency hospital care.

120.    On February 13, 2013, Plaintiff underwent a quadruple coronary artery bypass graft surgery and left carotid endarterectomy. These procedures were deemed medically necessary, as the fibrillations of the past year, beginning on March 31, 2012, had caused such significant heart muscle damage to be deemed a myocardial infarction.

121.    On March 15, 2013, Plaintiff underwent a right carotid endarterectomy.

122.    During all cardiac treatments beginning in March 2012, Plaintiff used AXIRON® as prescribed, as directed, and in a reasonably foreseeable manner.

123.    Plaintiff remains under the care of a cardiologist and must continue a regimen of medications for his cardiac health.

124.    On January 29, 2014, results of a PLOS ONE journal article finding increased risks of heart attack and cardiac events in men taking testosterone replacement therapy medications were given national attention. The findings were discussed in *The New York Times* and reached a national audience.

125.    After the PLOS ONE study, information was publicly available of the connection between testosterone replacement therapies like AXIRON® and heart attack.

126.    Plaintiff suffered damage to his heart caused by the artery compromise, which carries with it a higher risk for a variety of future cardiac events and even death.

127.    Plaintiff used AXIRON® that had been provided to him in a condition that was substantially the same as the condition in which it was manufactured and sold.

128.     Plaintiff incurred significant medical expenses as a result of the treatments he underwent, will incur future medical expenses as his injury has permanent ramifications, his ability to labor and earn money has been impaired, he is at increased risk for future health problems and disability, and he suffered physical pain and mental anguish.

129.     Defendants materially and deceptively misrepresented and mischaracterized the definition of hypogonadism to the Plaintiff and his physician.

130.     There was no warning to Plaintiff or his physician that the product presented a risk of myocardial infarctions and related heart conditions.

131.     The product warnings for AXIRON® that were in effect during the time period in which Plaintiff used AXIRON® were vague, incomplete, or otherwise inadequate, both substantively and graphically, to alert prescribing physicians as well as Plaintiff of the risk of heart attack, stroke, and death associated with this drug.

132.     Defendants did not provide adequate warnings to Plaintiff, Plaintiff's doctors, the healthcare community and the general public about the increased risk of serious adverse events that are described herein.

133.     Had Plaintiff and his physicians known of the deleterious and potentially catastrophic side effects associated with the use of testosterone medications, including AXIRON®, and the fact that it raised the likelihood of causing heart attacks, strokes, thrombotic events, and even death, he would not have taken the product or would have limited the dose and monitored carefully for specific health concerns.

### EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

134.     The running of any statute of limitation has been tolled by reason of Defendants' fraudulent conduct.  Defendants, through their affirmative misrepresentations and omissions,

actively concealed from Plaintiff and Plaintiff's prescribing physicians the true risks associated with using AXIRON®.

135. Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the truth, quality, and nature of AXIRON®. Defendants were under a duty to disclose the true character, quality, and nature of AXIRON® because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff, Plaintiff's medical providers, or to Plaintiff's health facilities. In addition, Defendants are estopped from relying on any statute of limitation because of their intentional concealment of these facts.

136. Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered; Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting a profitable drug, notwithstanding the known or reasonably-known risks. Plaintiff and Plaintiff's medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on Defendants' representations.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY: FAILURE TO WARN

137. Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

138. Defendants are liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement of Torts 2d.

139. The AXIRON® manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

140. Defendants failed to adequately warn consumers and/or their health care providers that AXIRON® could cause heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots.

141. Defendants failed to adequately warn consumers and/or their health care providers that while a patient was taking AXIRON® it was necessary to frequently monitor hematocrit and estradiol levels to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events, and blood clots.

142. The AXIRON® manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of AXIRON®, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

143.    The AXIRON® product reached Plaintiff STEPHEN TURNER without change in the condition in which the product was sold.

144.    As a direct and proximate result of Plaintiff's reasonably anticipated use of AXIRON® as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT II
## STRICT PRODUCTS LIABILITY: DESIGN DEFECT

145.    Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

146.    The defective product (exogenous testosterone) was sold in an unreasonably dangerous condition in that the benefits of the design and manufacture of AXIRON® are outweighed by the serious risk of said design, and the design violates the reasonable expectation of safety that consumers, and their physicians, have about AXIRON® when used for its intended and marketed purpose.

147.    Defendants participated in the manufacture, sale, and marketing of an exogenous testosterone drug that was FDA approved to treat a specific medical condition called hypogonadism, which is defined as a condition in which a male produces no or very low

testosterone in conjunction with an associated medical condition, such as failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

148.     Defendants manufactured, sold, and promoted the drug to treat a nonexistent medical condition they called "Low T," which was a name they created for the constellation of symptoms experienced by men as a result of the normal aging process.  In essence, Defendants marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

149.     The drug Defendants manufactured, sold, and promoted was unsafe and contained a defective condition in that in that it caused serious injuries and death as the result of the formation of blood clots and adverse cardiovascular events, including but not limited to deep vein thrombosis, pulmonary embolism, stroke, ischemic injuries, infarctions, coronary heart failure, and cardiovascular disease.

150.     This design defect made the drug unreasonably dangerous, yet Defendants knowingly introduced the drug into the market.

151.     The drug as manufactured by Defendants remained unchanged and was in the same condition at the time of the injury hereafter alleged.

152.     As a direct and proximate result of Plaintiff STEPHEN TURNER's reasonably anticipated use of AXIRON® as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under

applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT III**
**NEGLIGENCE**

153.    Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

154.    At all times herein mentioned, Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, labeling, producing, packaging, promoting, supplying, formulating, creating, developing, assembling, sale and distribution of AXIRON®, including a duty to assure that AXIRON® would not cause users to suffer unreasonable, dangerous side-effects, such as heart attacks, stroke and death.

155.    Defendants failed to exercise ordinary care and/or were reckless in the designing, researching, testing, manufacturing, marketing, labeling, producing, packaging, promoting, supplying, formulating, creating, developing, assembling, sale and distribution of AXIRON® into the stream of interstate commerce, in that the Defendants knew or should have known that the drug created a high risk of unreasonable harm, including heart attack, stroke and death.

156.    At all times material hereto, Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of AXIRON® to cause, or increase the harm of among other severe injuries, myocardial infarction, cerebrovascular accident, deep vein thrombosis and its sequelae, pulmonary embolism, and sudden cardiovascular death.

157.    Defendants had a duty of care when they undertook to provide comprehensive medical information to consumers and patients concerning "Low T" as a medical diagnostic

entity, to educate and inform consumers and patients about "Low T," and, to provide consumers and patients with the means for self-diagnostic screening and in-home testing for "Low T."

158.    Defendants had a duty to disclose to physicians and healthcare providers the causal relationship or association of AXIRON® to heart attack, stroke, deep vein thrombosis and its sequelae, pulmonary embolism, and sudden cardiac death.

159.    Defendants' duty of care owed to consumers and patients included providing accurate, true, and correct information concerning:

- hypogonadism and its diagnostic criteria;

- the FDA-approved indications for the clinical use of the AXIRON® product;

- the clinical safety and effectiveness profiles of AXIRON®; and,

- appropriate, complete, and accurate warnings concerning the adverse effects of AXIRON®, including heart attack, stroke, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

160.    At all times herein mentioned, Defendants breached their duty of care by negligently and carelessly manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling AXIRON® and by failing to adequately test and warn of the risks and dangers of testosterone replacement therapy as described herein.

161.    Defendants negligently and carelessly disregarded the applicable regulations and industry standards regarding the prohibition against off-label marketing, misbranding, and label expansion, and, as a result, millions of men, including Plaintiff, were prescribed AXIRON® unnecessarily, and therefore were needlessly exposed to serious health risks for which there were no or inadequate warnings.

162.    At all times material hereto, Defendants sought to mislead and misinform physicians concerning the FDA-approved uses for AXIRON®, including Plaintiff's prescribing physician.    Specifically, the FDA had not approved AXIRON® or any other testosterone-containing preparation for the treatment of "Low T."

163.    At all times material hereto, Defendants recklessly, intentionally, and knowingly detailed and promoted the testosterone-containing product AXIRON® with the intent that men be prescribed testosterone therapy by physicians for "off-label" clinical indications.

164.    Despite the fact that Defendants knew or should have known that AXIRON® caused unreasonable, dangerous side effects, Defendants continued to market AXIRON® to consumers including Plaintiff, when there were safer alternative methods and/or no need to treat conditions such as loss of energy, libido erectile dysfunction, depression, loss of muscle mass, and other conditions that AXIRON® marketing materials claim are caused by "Low T."

165.    At all times material hereto, Defendants misbranded the AXIRON® product on an ongoing and continuous basis, and failed to warn physicians and patients that AXIRON® was not approved for the treatment of "Low T," for the treatment of age-related declines in testosterone, or for the treatment of age-related symptoms in men.

166.    Defendants failed to disclose to physicians, consumers, and patients the known cardiovascular and cerebrovascular risks causally associated with AXIRON® use.

167.    As marketed, detailed, and promoted to physicians—including Plaintiff's prescribing physician—Defendants failed to warn that AXIRON® caused, or increased the risk of harm of, cardiovascular and cerebrovascular injuries, including myocardial infarction and cerebrovascular accident, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

168. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury because of Defendants' failure to exercise ordinary care as described above.

169. Defendants' negligence and/or recklessness was the proximate cause of Plaintiff's injuries, harm, and economic loss which Plaintiff has suffered and/or will continue to suffer.

170. Defendants' negligence was a direct and proximate result of Plaintiff's reasonably foreseeable injuries. Plaintiff STEPHEN TURNER suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (*Under* S.C. Code of Laws § 36-2-314)

171. Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

172. Prior to the time that the aforementioned products were used by Plaintiff STEPHEN TURNER, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that AXIRON® was of merchantable quality and safe and fit for the use for which it was intended.

173.     Specifically, Defendants warranted to Plaintiff that its product was intended to treat a condition called "Low T" and that it was safe and fit for that use, but Defendants failed to disclose that "Low T" is not a recognized medical condition and that its testosterone product was not FDA approved to treat any such condition.

174.     Plaintiff was and is unskilled in the research, design, and manufacture of medical drugs, including AXIRON®, and reasonably relied entirely on Defendants' skill, judgment, and implied warranty in using AXIRON®. As a result, Plaintiff trusted Defendants' warranty and used Defendants' product as Defendants intended it to be used.

175.     AXIRON® was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that AXIRON® has dangerous propensities when used as intended and will cause severe injuries to users.

176.     As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.


**COUNT V**
**NEGLIGENT MISREPRESENTATION**

177.     Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

178. Defendants have engaged in a pattern and practice of making negligent misrepresentations in obtaining regulatory approval of and otherwise marketing AXIRON®.

179. From the time AXIRON® was first tested, studied, researched, evaluated, endorsed, manufactured, marketed, and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians, and the general public, including but not limited to the misrepresentation that "Low T" was an actual disease/medical condition for which medical treatment was indicated, and that AXIRON® was safe, fit, effective, and FDA-approved for human consumption to treat "Low T." At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AXIRON® and willfully deceived Plaintiff, Plaintiff's physicians, and the general public as to the health risks and consequences of the use of the AXIRON®.

180. Defendants made the foregoing representations without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients, and the public, with the intention of inducing reliance and the prescription, purchase, and use of the subject product.

181. The representations by the Defendants were in fact false in that AXIRON® is not safe, fit, and effective for human consumption, using AXRION® is hazardous to health, and AXIRON® has a strong propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

182. The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase, and use of AXIRON®.

183. Plaintiff relied on the misrepresentations made by the Defendants to his detriment. Specifically, Plaintiff relied on representations that "Low T" was an actual disease that required

- 41 -

medical treatment and use of prescription testosterone, that AXRION® was FDA-approved to treat a condition called "Low T," and that the Defendants' testosterone drug was a safe and effective treatment for his "Low T."

184.   In reliance on Defendants' misrepresentations, Plaintiff was induced to purchase and use AXIRON®.  If Plaintiff had known of the true facts and the facts concealed by the Defendants, he would not have used AXIRON®.  The reliance by Plaintiff on Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

185.   As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff STEPHEN TURNER suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT VI
## <u>UNJUST ENRICHMENT</u>

186.   Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

187.   Defendants are and at all times were the manufacturer, seller and/or supplier of the prescription testosterone transdermal system, AXIRON®.

188.   Plaintiff paid for AXIRON® for the purpose of testosterone replacement therapy.

189.   Defendants have accepted payment by Plaintiff for the purchase of AXIRON®.

190.     Plaintiff did not receive the safe and effective testosterone replacement therapy, for which Plaintiff has paid.

191.     It would be inequitable for Defendants to keep this money if Plaintiff did not in fact receive a safe and effective testosterone replacement therapy.

192.     As a result of the foregoing acts by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law and in the alternative, requests restitution and disgorgement of profits, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT VII**
**PUNITIVE DAMAGES ALLEGATIONS**

193.     Plaintiff adopt by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

194.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights, health, and safety of Plaintiff STEPHEN TURNER and other AXIRON® users and for the primary purpose of increasing Defendants' profits from the sale and distribution of AXIRON®. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

- 43 -

195.     Prior to the manufacturing, sale, and distribution of AXIRON®, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries.  Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff, and, as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using AXIRON®.

196.     Despite its knowledge, Defendants, acting through their officers, directors, and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in AXIRON® and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in AXIRON®. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution, and marketing of AXIRON® knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

197.     Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

**WHEREFORE**, Plaintiff demand judgment against the Defendants individually, jointly and/or severally, and demands compensatory, statutory, and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## **PRAYER**

**WHEREFORE,** Plaintiff pray for judgment, in aggregate to exceed $75,000, against Defendants, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff STEPHEN TURNER:

A.   General damages in an amount that will conform to proof at time of trial;

B.   Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C.   Medical expenses, past and future, according to proof at the time of trial;

D.   For past and future mental and emotional distress, according to proof;

E.   For punitive or exemplary damages according to proof;

F.   Restitution, disgorgement of profits, and other equitable relief;

G.   Statutory damages;

H.   Injunctive relief;

I.   Attorneys' fees;

J.   For costs of suit incurred herein;

K.   For pre-judgment interest as provided by law; and

L.   For such other and further relief as the Court may deem just and proper.


## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable in this action.

February 10, 2015

Respectfully Submitted,

*/s/ Lisa Faye Petak*
Lisa Faye Petak (CA SBN: 300914)
**WEITZ & LUXENBERG, P.C.**
700 Broadway

- 45 -

New York, New York 10003
Telephone: (212) 440-1338
Facsimile: (646) 293-4304
E-mail:  lpetak@weitzlux.com


Ellen Relkin (NJ SBN: 006691985)
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, New York 10003
Telephone: (212) 558-5715
Facsimile: (212) 344-5461
E-mail:  erelkin@weitzlux.com

*Attorneys for Plaintiff, Stephen Turner.*

PLAINTIFF'S COMPLAINT

**CERTIFICATE OF SERVICE**

    I certify a copy of the foregoing Complaint was electronically filed through the Court's Electronic Case Filing System on February 10, 2015.  All parties may access this filing through that system.

                Respectfully Submitted,

                */s/ Lisa Faye Petak*
                Lisa Faye Petak (CA SBN: 300914)
                **WEITZ & LUXENBERG, P.C.**
                700 Broadway
                New York, New York 10003
                Telephone: (212) 440-1338
                Facsimile: (646) 293-4304
                E-mail:  lpetak@weitzlux.com

                Ellen Relkin (NJ SBN: 006691985)
                **WEITZ & LUXENBERG, P.C.**
                700 Broadway
                New York, New York 10003
                Telephone: (212) 558-5715
                Facsimile: (212) 344-5461
                E-mail:  erelkin@weitzlux.com

                *Attorneys for Plaintiff, Stephen Turner.*